******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., concurring in part and dissenting in part. One sign that something has gone wrong in our case law is that a legal precedent produces nonsensical results over time. The present case illustrates the dangers of following ill-conceived precedent off the proverbial cliff. A man who cannot stop thinking about an ex-girlfriend is admitted to a hospital. He reveals to the hospital staff that he is totally obsessed with her, he owns guns, and he is thinking about killing her, a pathological condition antiseptically known in psychiatric parlance as homicidal ideation. The patient is transferred to an affiliated psychiatric hospital, which then releases him within a matter of days, with no warning to the girlfriend. Obsession fast becomes reality when, the very next day, the man murders the girlfriend and then kills himself. We hold today that our case law allows the killer's estate to sue the psychiatric hospital for medical negligence but bars the victim's estate from doing so—unless, perhaps, the victim happens to have been married to her killer at the time of the murder, in which case the statutory prohibition somehow disappears.

We are trapped in this thicket of unreason only because we must follow the court's decision in *Jarmie* v. *Troncale*, 306 Conn. 578, 50 A.3d 802 (2012), which construes General Statutes § 52-190a to bar claims brought by a nonpatient for injuries or death caused by a health care provider's professional negligence. See id., 587–89. In my view, *Jarmie* is a deeply flawed decision that has created an untenable doctrinal framework, leading to unjust results, based on a construction of § 52-190a that was never intended by the legislature. The problem is not only that *Jarmie* was wrongly decided at the time. Its long shadow has since forced this court to work around its erroneous holding in a string of subsequent decisions—including the present one—that sows further doctrinal confusion and inconsistencies.

In the absence of a request to overrule *Jarmie*,[1] the majority follows that precedent where it leads and, con-

[1]The plaintiff is Angela Ashworth, administratrix of the estate of her daughter, the victim, Caroline Anne Ashworth. In her brief on appeal, the plaintiff makes only a generic request that we "limit or restrict

sequently, holds that §52-190a bars the medical negligence[2] claims brought by the plaintiff, Angela Ashworth, administratrix of the estate of her daughter, Caroline Anne Ashworth (decedent), against the defendant SVMC Holdings, Inc.[3] I agree with the majority that the statute, as it was construed by a majority of this court in *Jarmie*, precludes the plaintiff, as a nonpatient, from bringing most of her claims against the defendant arising from the defendant's alleged failure to comply with the professional standard of care governing its duty to warn and to otherwise protect the decedent, an identifiable victim, from the foreseeable homicidal acts of Michael Mollow.[4] I therefore concur in the result reached by the majority, which concludes that the plaintiff's claims are barred to the extent that they are based on allegations of medical negligence. I write separately to explain why *Jarmie*

any Connecticut authority contrary to the recognition of the cause of action sought by the plaintiff under the circumstances of this case." Parties often make litigation decisions on the basis of existing law and, understandably, do not lightly assume that the overruling of precedent is in the cards, but a request to overrule precedent ordinarily must be fully briefed to be entertained by this court.

[2] To clarify, I primarily will use the term "medical negligence" throughout this opinion to refer to a negligence claim against a health care provider alleging a breach of the applicable professional standard of care. Medical negligence is professional negligence by a health care provider and means the same thing as medical malpractice. I therefore use the terms interchangeably. However, I caution that the latter term may be misunderstood to imply that a medical malpractice claim is a statutory cause of action in Connecticut. It is not. Medical malpractice remains a common-law claim describing a claim of professional negligence against a health care provider, and neither §52-190a nor any other statute creates a cause of action for medical malpractice in Connecticut. See, e.g., *Escobar-Santana* v. *State*, 347 Conn. 601, 624, 298 A.3d 1222 (2023) ("although procedurally circumscribed by statute, medical malpractice claims are [still] brought pursuant to the common law" (internal quotation marks omitted)).

[3] The town of Branford and Christopher J. Donlin, administrator of the estate of Michael Mollow, are also defendants in this action. Neither Donlin nor the town is participating in this appeal because separate claims against them remain pending in the trial court. Accordingly, I refer in this opinion to SVMC Holdings, Inc., as the defendant.

[4] I also agree that counts two through six of the complaint state a cognizable claim for "ordinary negligence" sufficient, under *Jarmie*, to survive a motion to strike. See parts I and II of the majority opinion.

gravely misconstrued § 52-190a and should be overruled when the opportunity arises. In addition, I dissent from that aspect of the majority opinion holding that count seven of the plaintiff's complaint fails to state a claim of gross negligence. See part III of this opinion; see also part III of the majority opinion.

I

Before conducting the statutory construction that the majority in *Jarmie* neglected to undertake, I offer two introductory observations regarding the dubious precedential value of that case. These remarks are pertinent because the doctrine of stare decisis always deserves serious attention when precedent is challenged on the ground that it was wrongly decided. To overcome the force of stare decisis in the present case, I rely primarily on what I consider to be the overwhelming merits of the legal analysis pursued in this opinion. The following two preliminary considerations further diminish any concern about adhering to the holding in *Jarmie* based on § 52-190a.

The first and most prominent of these points focuses on this court's recent decision in *Carpenter* v. *Daar*, 346 Conn. 80, 287 A.3d 1027 (2023). *Carpenter* also involved the proper construction of § 52-190a and, of critical significance for present purposes, overruled this court's decision in *Morgan* v. *Hartford Hospital*, 301 Conn. 388, 21 A.3d 451 (2011). See *Carpenter* v. *Daar*, supra, 84–87. *Morgan* had construed § 52-190a to impose a jurisdictional requirement, such that failure to timely submit a fully compliant expert opinion letter[5] is fatal to a medical negligence action, however meritorious. See id., 100–103. It reached that conclusion even though

[5]"Opinion letter" is the shorthand term used in our case law to refer to the statutory requirement of "a written and signed opinion of a similar health care provider . . . [stating] that there appears to be evidence of medical negligence and includ[ing] a detailed basis for the formation of such opinion." General Statutes § 52-190a (a); see, e.g., *Carpenter* v. *Daar*, supra, 346 Conn. 84. The opinion letter must be attached to the plaintiff's complaint in any action to which the statute applies. See General Statutes § 52-190a (a).

§ 52-190a does not speak in jurisdictional language; see id., 105–107; and, by all accounts, the legislature's intention in imposing the requirement was merely to ensure an adequate, good faith investigation so as to eliminate frivolous cases. See, e.g., id., 124; see also *Lynch* v. *State*, 348 Conn. 478, 504 n.18, 308 A.3d 1 (2024); footnote 14 of the majority opinion. In overruling *Morgan*, the court in *Carpenter* unanimously concluded that the legislature never intended § 52-190a to transform "what the legislature intended to be a simple prelitigation documentation of the plaintiff's good faith inquiry into, in essence, a trap under which even meritorious suits are subject to dismissal." *Carpenter* v. *Daar*, supra, 124. As I will discuss in part II of this opinion, *Carpenter* is only the most recent in a line of decisions holding that overly literalistic interpretations of § 52-190a must be eschewed in favor of more reasonable, commonsense constructions that comport with the purpose of the statute. See, e.g., *Shortell* v. *Cavanagh*, 300 Conn. 383, 388–90, 15 A.3d 1042 (2011); *Dias* v. *Grady*, 292 Conn. 350, 359–61, 972 A.2d 715 (2009).

*Carpenter* is important because *Jarmie* is another *Morgan* era decision, and the majority in *Jarmie* was similarly and equally misguided in its construction of § 52-190a to impose more than prelitigation procedural requirements designed to prevent frivolous medical malpractice claims. After *Carpenter*, no viable argument remains that § 52-190a imposes any substantive limitations on such claims. Simply put, *Jarmie* erroneously read into a purely procedural statute a substantive bar prohibiting actions by nonpatients involving allegations of medical negligence.

The second set of preliminary observations focuses on the fact that *Jarmie* adjudicated the statutory issue in an unusually casual manner, and its irregular methodology undoubtedly contributed to the flawed result. To begin with, the trial court in *Jarmie* did not purport to rely on § 52-190a when it struck the plaintiff's complaint; nor did it conclude that the legislature has barred actions by

nonpatients involving allegations of medical negligence. See *Jarmie* v. *Troncale*, Superior Court, judicial district of New Haven, Docket No. CV-08-5021176 (December 31, 2008) (46 Conn. L. Rptr. 874, 875–76), aff'd, 306 Conn. 578, 50 A.3d 802 (2012). In their brief to this court, the defendants in *Jarmie* argued only in passing that § 52-190a barred the plaintiff's medical negligence claims because of his status as a nonpatient. See *Jarmie* v. *Troncale*, Conn. Supreme Court Records & Briefs, March Term, 2012, Defendants' Brief pp. 3–7. Their statutory argument covered one and one-half pages of their brief and consisted largely of quoting out of context a portion of *Plainville* v. *Wheeler Clinic, Inc.*, Superior Court, judicial district of New Britain, Docket No. HHB-CV-07-5004904 (December 11, 2008) (46 Conn. L. Rptr. 812, 813–14), in which the trial court construed § 52-190a to mean the very opposite of the result reached by this court in *Jarmie*. See *Jarmie* v. *Troncale*, Conn. Supreme Court Records & Briefs, supra, Defendants' Brief pp. 5–6; see also part II A of this opinion.

Of still greater concern is that the *Jarmie* majority adopted the defendants' statutory argument by way of a truncated analysis incommensurate with the far-reaching implications of its conclusion that § 52-190a established a statutory prohibition against all actions by nonpatients involving allegations of medical negligence. The entire discussion in *Jarmie* spans a total of three paragraphs, and the court's actual analysis of the statute is confined to a single conclusory sentence, followed by citations to three cases having nothing to do with the issue at hand. See *Jarmie* v. *Troncale*, supra, 306 Conn. 587–88. It is fair to say that the *Jarmie* majority did not engage in the usual methodology applied in Connecticut to construe a statute.

More specifically, the decision does not mention General Statutes § 1-2z or its common-law antecedents, and it neglects to apply the highly developed and entrenched principles of statutory construction that guide our analysis in virtually every case in which we are called on to determine the meaning of a statute. See generally id. In

*Jarmie*, that methodology would have required the court to consider as a threshold matter whether the statutory text and its context rendered § 52-190a ambiguous with respect to the question being addressed, namely, whether the statute prohibits a nonpatient from bringing a personal injury or wrongful death action against a health care provider on the basis of allegations of negligence in the care or treatment of the provider's patient. As I will discuss in greater detail hereinafter, *Jarmie* failed even to mention, let alone analyze, such key considerations as **(1)** whether a plausible alternative construction of the statute rendered its meaning ambiguous, **(2)** whether, applying established principles of statutory construction, that alternative construction was preferable, and **(3)** whether, in light of the ambiguity, the intended meaning of the statute can be ascertained by examining the legislative history of the statute, including the manner in which Florida's appellate courts have construed the Florida statute on which § 52-190a was modeled.

These methodological shortcomings extend beyond the internal mechanics of *Jarmie*'s statutory construction. Viewing the opinion from start to finish reveals that the court need not have reached the statutory issue at all. This is so because the majority in *Jarmie* concluded, as a matter of Connecticut common law, that the defendants owed no duty of care to the plaintiff; as a "random pedestrian," the plaintiff was not an identifiable victim of the alleged negligence. Id., 597. All of the plaintiff's claims were consequently barred as a matter of law, regardless of any statutory considerations. Seen in this light, the entire discussion of § 52-190a in *Jarmie* is dictum. See, e.g., *Honulik* v. *Greenwich*, 293 Conn. 641, 645 n.5, 980 A.2d 845 (2009). I will not treat it as such in this opinion because this court has not done so, either in *Jarmie* or in subsequent decisions, including the present one, but the point remains that *Jarmie*'s precedential value is doubtful from the beginning because its statutory analysis was unnecessary to the outcome.[6]

[6]The common-law analysis in *Jarmie*, although dispositive in that case, is inapplicable in the present case because, as the majority in this case correctly observes, *Jarmie* involved an unidentifiable victim to

To summarize these preliminary considerations, the *Jarmie* majority reached out unnecessarily to construe a statute that had not formed the basis of the trial court's decision and was not necessary for resolution of the appeal, which, unlike the present case, involved an unidentifiable victim. The *Jarmie* majority nonetheless took the occasion to construe §52-190a to foreclose, as a matter of law, a broad range of potentially meritorious third-party medical negligence claims.[7] The *Jarmie* majority offered only the scantest analysis in support of its construction, the implications of which extended well beyond the narrow factual confines of that case. As I will further elaborate in part II A of this opinion, the *Jarmie* majority did so without acknowledging or addressing the plausibility of contrary constructions adopted by a court in Connecticut and one other jurisdiction (Florida) construing a statute identical to § 52-190a in all relevant respects. The flawed methodology inevitably led to flawed results.

## II

### A

A careful review of §52-190a reveals the inadequate nature of *Jarmie*'s construction of the statute. The

---

whom no duty was owed under Connecticut common law, whereas the decedent in this case was an identifiable victim. *Jarmie* also arose outside of the singular context of duties owed to third parties by mental health care professionals.

[7]There are various species of third-party (nonpatient) tort claims predicated on underlying allegations of medical negligence. These include, without limitation, *Tarasoff* type claims; see *Tarasoff* v. *Regents of the University of California*, 17 Cal. 3d 425, 430–32, 551 P.2d 334, 131 Cal. Rptr. 14 (1976) (failure to warn or protect identifiable third party who may be at risk of being harmed by psychiatric patient); *Cochran* type claims; see *Doe* v. *Cochran*, 332 Conn. 325, 327–28, 351–52, 210 A.3d 469 (2019) (failure to notify, educate, or otherwise warn patient or identifiable third party who is at foreseeable risk of harm from contagious or communicable disease); *Squeo* type claims; see *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 560–61, 581, 113 A.3d 932 (2015) (claim of bystander emotional distress arising from patently and grossly negligent medical care); and claims alleging that a physician failed to educate a patient whose children were at risk from a heritable genetic disease. See, e.g., *Pate* v. *Threlkel*, 661 So. 2d 278, 279 (Fla. 1995).

language at issue is contained in the initial sentence of §52-190a (a): "No civil action or apportionment complaint shall be filed to recover damages resulting from personal injury or wrongful death . . . whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, unless the attorney or party filing the action or apportionment complaint has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant." This language has remained substantially unchanged since the legislature enacted the original law in 1986, as part of what is known as Tort Reform I. See Public Acts 1986, No. 86-338, §12 (P.A. 86-338); see, e.g., *Daley* v. *Kashmanian*, 344 Conn. 464, 482, 280 A.3d 68 (2022).

The first thing to notice, even before analyzing the semantics and syntax of this provision, is that the statute imposes *procedural* requirements (the need to conduct a good faith inquiry and to obtain a presuit opinion letter from a qualified health care professional) on a certain category of professional negligence cases. See part I of this opinion (discussing *Carpenter* v. *Daar*, supra, 346 Conn. 80). It is now well established that §52-190a, like the other components of the tort reform legislation relating to medical negligence claims, does not purport to effectuate any substantive or jurisdictional changes in the common law governing such claims. Our post-*Jarmie* case law explains that the statute "regulates pleading and service of process . . . [but] has been expressly construed . . . as having no effect on the standard for substantive liability . . . ." (Internal quotation marks omitted.) *Carpenter* v. *Daar*, supra, 115; accord *Corley* v. *United States*, 11 F.4th 79, 87 (2d Cir. 2021); see also *Dias* v. *Grady*, supra, 292 Conn. 359. The *Jarmie* majority did not have the full benefit of these later insights regarding the procedural nature of the statutory scheme, but the precedential and persuasive value of the decision nonetheless is diminished by reason of these subsequent developments.

Turning to the statutory text, I note that there are at least three plausible ways to construe the relevant language. As we shall see, two of these alternatives were never considered by the *Jarmie* majority, and the third was insufficiently vetted.

The first plausible reading, which I consider the best of the three, is the commonsense construction that Judge Patty Jenkins Pittman adopted in *Plainville* v. *Wheeler Clinic, Inc.*, supra, 46 Conn. L. Rptr. 812, several years before *Jarmie* was decided.[8] The issue in *Plainville*, which the trial court described as one of first impression in Connecticut, arose in connection with a medical negligence claim brought by a police officer against a health clinic after the officer was injured while attempting to subdue a patient at the clinic. Id., 812–13. The plaintiff town alleged that the officer's injuries were proximately caused by the defendant clinic's medical negligence relating to its staffing and procedures, as well as its care or treatment of the patient. Id. The court reviewed the text and legislative history of § 52-190a (a), as well as the manner in which sister states such as Florida have construed similar statutes.[9] Id., 813–14. Based on this analysis, the court concluded that § 52-190a governs only those medical malpractice actions that are initiated by patients; it simply does not speak, one way or the other, to actions brought by nonpatients. Id., 814.

The second plausible construction resides at the other end of the spectrum. If one were to read the first sentence of § 52-190a (a) strictly, literally, and in isolation, the result would be to prohibit not only third-party medical malpractice actions but also a wide range of what we call "ordinary" negligence actions against health care providers. This construction would emphasize that the

---

[8]For the sake of simplicity, I will hereinafter refer to this construction of § 52-190a (a) as the *Plainville* construction. I add one caveat to my endorsement of this construction in part II C of this opinion.

[9]As I will discuss, the manner in which the Florida courts have construed that state's version of § 52-190a carries special persuasive force in Connecticut because our legislature almost certainly modeled § 52-190a on the Florida statute. See part II B of this opinion.

statutory language, by its terms, does not speak of, and is not limited to, medical malpractice actions. Rather, the statute applies to *any* personal injury or wrongful death action alleging that the injury or death "resulted from the negligence of a health care provider," a broad phrase that, on its face, sweeps in ordinary as well as professional negligence. General Statutes § 52-190a (a). The text purports to bar *all* such actions, unless they are supported by a letter from "a similar health care provider" opining "that there appears to be evidence of medical negligence . . . ." General Statutes § 52-190a (a). If we read the statutory language verbatim, and conclude, as *Jarmie* did, that the literal language of the statute permits only those claims filed by patients, then we must acknowledge that the same text also bars, at the very least, all manner of ordinary negligence claims brought by hospital visitors and other nonpatients; the first sentence would preclude everything from the type of claim that we allowed to proceed in *Doe* v. *Cochran*, 332 Conn. 325, 327–28, 336–38, 210 A.3d 469 (2019), to routine slip and falls. Indeed, reading the statute literally would preclude even those ordinary negligence claims brought by patients themselves, insofar as the first sentence of § 52-190a (a) bars any action alleging the negligence of a health care provider unless there is evidence of *medical* negligence.

Although these two constructions provide the most natural readings of the statutory language, *Jarmie* failed even to mention, let alone adopt, either one. Instead, without any evident effort to consider other constructions that would make sense of the statutory scheme, *Jarmie* adopted a third, alternative construction of the statute, as if it were the only choice available. This construction reads certain selected portions of the statute strictly and literally, while altogether ignoring any semantic or syntactic indications of a different meaning. Specifically, *Jarmie*'s interpretation of § 52-190a focused entirely on a single word appearing at the very end of the statute's first sentence: "'claimant.'" (Emphasis omitted.) *Jarmie* v. *Troncale*, supra, 306 Conn. 587.

The *Jarmie* majority observed that the statute requires, before the filing of an action seeking damages for personal injury or death resulting from the negligence of a health care provider, "'a good faith belief that there has been negligence in the *care or treatment of the claimant*'"; (emphasis in original) id.; and concluded, without testing the proposition against common sense or considering any other standard tools of construction, that the word "claimant" must mean the plaintiff bringing the negligence action. See id., 587–89. Thus, because the statute stipulates that claimants are patients receiving care or treatment from health care providers, it follows that nonpatients cannot be plaintiffs in any action alleging medical negligence against health care providers. Quod erat demonstratum.

As a cursory reading of the statute's literal language, construed in a vacuum, this construction is plausible. However, it is by no means the only plausible reading of the statute, and its entire weight rests on the sudden and wholly unexpected appearance of a solitary word at the end of the first sentence. Nothing else in the statutory scheme gives any indication that the legislature intended to bar all nonpatient claims involving allegations of medical malpractice against health care providers, and, if the court in *Jarmie* had consulted the standard principles of statutory construction, it would have realized that an alternative reading of § 52-190a was far more plausible.

First, and most broadly, the court would be well-advised in this case to take heed of the admonition that "[the legislature] does not hide elephants in mouseholes." (Internal quotation marks omitted.) *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U.S. 416, 431, 138 S. Ct. 1061, 200 L. Ed. 2d 332 (2018); see also, e.g., *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, 350 Conn. 525, 547, 325 A.3d 196 (2024) ("it is unlikely that the legislature would have enacted a sea change in [a statutory scheme] . . . without acknowledging that change"); *New Haven* v. *Board of Education*, 228 Conn. 699, 719, 638 A.2d 589 (1994) ("[w]e will not infer that the legislature intended to

enact a significant change in existing law without an unequivocally expressed manifestation of legislative intent'' (internal quotation marks omitted)). If the legislature had intended to use the procedural vehicle of the good faith inquiry requirement to impose a substantive prohibition on all third-party actions against health care providers, surely, there were clearer, more direct ways to do so. Other Connecticut statutes make it abundantly clear when the legislature has intended to foreclose third-party liability for a category of plaintiffs, claims, or defendants.[10]

Of course, there is no requirement that the legislature use the clearest and most direct language possible when drafting a statute. But *Jarmie* reads a major, substantive limitation into a statute that, in all other respects, contains no provisions purporting to define or delimit the substantive components of a lawsuit seeking damages caused by medical negligence. Indeed, this same misstep was one of the primary reasons why we overruled *Morgan* in *Carpenter*. We explained that ''the absence of jurisdictional language puts § 52-190a in stark contrast to other

---

[10]See, e.g., General Statutes § 21a-286 (f) (''[a] prescribing practitioner or pharmacist who enters into an agreement [with a host agency to provide training to persons who will distribute or administer opioid antagonists for the reversal of opioid overdoses] shall not be liable for damages in a civil action or subject to administrative or criminal prosecution for the administration or dispensing of an opioid antagonist by the host agency who is a party to such agreement''); General Statutes § 31-221e (c) (4) (''[a] professional employer organization shall not be liable for the acts, errors or omissions of a client or of any covered employee of the client when such covered employee is acting under the express direction and control of the client''); General Statutes § 38a-78 (b) (7) (with certain exceptions, qualified actuary submitting opinion as to value of insurance company's outstanding policies and contracts ''shall not be liable for damages to any person, other than the insurance company and the [insurance] commissioner, for any act, error, omission, decision or conduct with respect to the actuary's opinion''); General Statutes § 52-239 (''[t]he owner, licensee or operator of a visual or sound radio broadcasting station . . . shall not be liable for any damages for any defamatory statement uttered over the facilities of the station . . . by or on behalf of a candidate for public office or by any other person''); General Statutes § 52-572p (a) (''[a] product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party unless'' certain circumstances exist).

statutes governing personal jurisdiction and the service of process in a wide variety of contexts": *Carpenter* v. *Daar*, supra, 346 Conn. 105; and that "[t]he legislature's failure to use the terms 'personal jurisdiction' or 'service of process' in § 52-190a, when it so readily uses those terms in other statutes in the same title governing civil actions, provides strong textual evidence that the legislature did not intend the opinion letter and good faith certificate to implicate the court's personal jurisdiction." Id., 107. In my view, it is not reasonable to believe that our legislature intended to wade silently into the waters inhabited by the well-known and controversial *Tarasoff*[11] doctrine, to depart from the prevailing approach by categorically foreclosing such claims, and then to bury that policy choice in the connotative shadows of the final word of a procedural statute designed only to prescribe the contents of the good faith opinion letter that must accompany a claim for medical negligence.

Second, we repeatedly have emphasized that "[s]trict construction does not mean that a statute must be read in isolation." (Internal quotation marks omitted.) *State* v. *John F.M.*, 285 Conn. 528, 547, 940 A.2d 755 (2008). "[C]ontext matters in statutory construction, as do practical consequences . . . ." *Blondeau* v. *Baltierra*, 337 Conn. 127, 137, 252 A.3d 317 (2020). *Jarmie* concluded that the statute established a substantive limitation, precluding actions by nonpatients involving allegations of medical negligence, on the basis of one single, isolated word. See *Jarmie* v. *Troncale*, supra, 306 Conn. 587–89. But a contextualized reading tells a different story. Section 52-190a is codified in chapter 900 of the General Statutes, which governs "[c]ourt [p]ractice and [p]rocedure." The remainder of the statute is addressed to various purely procedural concerns, including the intricacies of the good faith certificate requirement; see General Statutes § 52-190a (a); and the availability of a ninety day extension to allow for a reasonable inquiry. See General Statutes § 52-190a (b). Neighboring statutes

[11]*Tarasoff* v. *Regents of the University of California*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976); see, e.g., *Plainville* v. *Wheeler Clinic, Inc.*, supra, 46 Conn. L. Rptr. 813 (discussing *Tarasoff*).

govern things like the proper form of bonds and recognizance for prosecution; General Statutes §§ 52-185 and 52-189; the routing of actions to the complex litigation docket; General Statutes § 52-190b; mandatory mediation procedures; General Statutes § 52-190c; and the precedence of certain civil actions over others. General Statutes §§ 52-191 through 52-192. Not surprisingly, given the subject area, the word "claimant" is used in various contexts throughout chapter 900. The word "patient" is not. Similarly, "claimant" is used more than forty times in P.A. 86-338, the tort reform statute, with respect to various categories of torts, whereas "patient" does not appear a single time in the act. These observations strongly support the notion that § 52-190a, like the statutes surrounding it, sets forth purely procedural rights, and the legislature simply did not consider that its use of the same word ("claimant") throughout like statutes could, in this particular instance, be misunderstood to have the unforeseen and unintended effect of foreclosing common-law actions in which the claimant is not the direct victim of negligence.

A third, corollary principle is that statutory words are confined to the subject matter that the legislature had in view, and, therefore, we must be wary lest generalized words such as "any" or "no" be given an overly broad, literal sweep that extends beyond the types of core cases that the statute was written to address. This is a canon of statutory construction with historical roots that reach back to the earliest days of the republic; see, e.g., *United States* v. *Palmer*, 16 U.S. (3 Wheat.) 610, 631, 4 L. Ed. 471 (1818); see also *Holy Trinity Church* v. *United States*, 143 U.S. 457, 458–59, 12 S. Ct. 511, 36 L. Ed. 226 (1892); and it retains vitality today. See, e.g., *Yates* v. *United States*, 574 U.S. 528, 546, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015); *American Civil Liberties Union* v. *Dept. of Defense*, 543 F.3d 59, 68–69 (2d Cir. 2008), vacated on other grounds, 558 U.S. 1042, 130 S. Ct. 777, 175 L. Ed. 2d 508 (2009). The principle has been invoked by this state's appellate courts as well. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 524, 540, 949 A.2d

1092 (2008); *Fairchild Heights, Inc.* v. *Dickal*, 118 Conn. App. 163, 177, 983 A.2d 35 (2009), aff'd, 305 Conn. 488, 45 A.3d 627 (2012). Its application to § 52-190a helps us see that one way to understand the error in *Jarmie*'s reasoning is that the case construed the statute's opening phrase, "[n]o civil action or apportionment complaint," in the broadest possible sense, whereas the context indicates that the good faith certificate requirement was never intended to apply to actions involving allegations of medical negligence brought by nonpatients. But see part II C of this opinion.

Fourth, statutes in derogation of the common law are to be strictly construed and should not be interpreted to limit or impair a common-law interest, unless "the language of the legislature plainly and unambiguously reflects such an intent . . . ." (Internal quotation marks omitted.) *Kumah* v. *Brown*, 307 Conn. 620, 630, 58 A.3d 247 (2013). In *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 848 A.2d 418 (2004), this court explained that § 52-190a is "in derogation of the common law" and, for that reason, should be narrowly construed. Id., 37; see also *Dias* v. *Grady*, supra, 292 Conn. 359–60.

Indeed, *Jarmie* itself acknowledged that our common law has been open to recognizing third-party medical negligence claims when the claimant is an identifiable victim of the negligent act or omission. See *Jarmie* v. *Troncale*, supra, 306 Conn. 594 (referring to "past cases in which this court has limited foreseeable victims of a health care provider's negligence to identifiable persons"); id., 586 ("there [is] nothing in . . . the case law of this state that precludes the plaintiff from bringing an action against the defendants on negligence grounds"); see also id., 595–97 (discussing Connecticut common-law precedent involving identifiable victims). This principle of construction also counsels in favor of a meaning that does not produce a result in tension with the common law.

With respect to professional negligence actions against health care providers in particular, common-law causes

of action by nonpatients had been recognized in many of our sister states prior to the adoption of §52-190a. See generally F. Buckner & M. Firestone, "'Where the Public Peril Begins': 25 Years After *Tarasoff*," 21 J. Legal Med. 187 (2000). Significantly, even after the enactment of §52-190a, this court analyzed a *Tarasoff* type case without any indication whatsoever that the statute would stand as an impediment. See *Fraser* v. *United States*, 236 Conn. 625, 632, 674 A.2d 811 (1996) (rejecting claim by estate of nonpatient because decedent was not identifiable victim, "our decisions defining negligence do not impose a duty to those who are not identifiable victims," and, "in related areas of our common law, we have concluded that there is no duty except to identifiable persons"); see also *Jacoby* v. *Brinckerhoff*, 250 Conn. 86, 96, 735 A.2d 347 (1999) ("To protect the integrity of the therapeutic relationship, we held [in *Fraser*] that a duty to disclose the substantial risk of . . . an act of violence would arise only if the third person was an identifiable victim or a member of a class of identifiable victims. . . . Such an exception was warranted, we held, in the event of an imminent risk of serious personal injury to identifiable victims." (Citations omitted.)).[12] Prior to the enactment of tort reform in 1986, moreover, Connecticut also had recognized third-party professional negligence claims in other contexts. See, e.g., *Licata* v. *Spector*, 26 Conn. Supp. 378, 378–79, 383–84, 225 A.2d 28 (1966) (allowing third-party negligence claim against attorney and observing, with respect to rejection of privity

[12]Notably, under Connecticut law, a plaintiff's status as an identifiable victim subject to imminent harm gives rise to a duty of care when none otherwise existed, and that duty is sufficiently well-defined to overcome even the defense of governmental immunity. See, e.g., *Grady* v. *Somers*, 294 Conn. 324, 331–349, 984 A.2d 684 (2009) (discussing identifiable person, imminent harm, common-law exception to municipal employees' qualified immunity and holding that such exception was not extinguished by codification of that immunity in General Statutes §52-557n). See generally *Sestito* v. *Groton,* 178 Conn. 520, 423 A.2d 165 (1979) (decision often cited as establishing identifiable person, imminent harm exception to governmental immunity). *Jarmie* thus reads §52-190a to silently establish a newfangled immunity that is broader in scope than the immunity historically enjoyed by municipalities and their agents.

requirement, that "Connecticut was one of the states at the vanguard of this legalistic revolution"). Far from conducting an analysis in accordance with a clear statement requirement, the majority in *Jarmie* failed even to consider whether it was sensible to conclude that the legislature would foreclose a myriad of common-law claims without clearly signaling its intent to do so.[13]

Fifth, *Jarmie* is predicated on the assumption that a strict, literal reading of § 52-190a is to be favored over a reasonable, commonsense construction. That is not the approach we usually take. See, e.g., *Casey* v. *Lamont*, 338 Conn. 479, 493, 258 A.3d 647 (2021) ("[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended" (internal quotation marks omitted)). And, in this case, the literalist approach is demonstrably misguided. As I have discussed, a literal reading of the language of the statute would require us to conclude that it bars even "ordinary" negligence claims brought by patients themselves because the text applies to any action seeking damages for injury or death resulting from "the negligence of a health care provider . . . ."

---

[13]For related reasons, the Supreme Court of Florida, in construing that state's substantially similar statute; see part II B of this opinion; repeatedly has eschewed overly strict interpretations of the statutory language that would have the effect of preventing the litigation of meritorious medical malpractice claims. See, e.g., *Musculoskeletal Institute Chartered* v. *Parham*, 745 So. 2d 946, 952 (Fla. 1999) ("[O]ur decision is in accord with our repeated interpretations of this unique statutory framework so as to effectuate its intended [purpose of promoting] presuit investigation and screening of claims without unconstitutionally impeding a citizen's access to the courts . . . . [R]estrictions on access to the courts must be construed in a manner that favors access . . . ." (Citations omitted; internal quotation marks omitted.)); *Kukral* v. *Mekras*, 679 So. 2d 278, 284 (Fla. 1996) ("[T]he medical malpractice statutory scheme must be interpreted liberally so as not to unduly restrict a Florida citizen's constitutionally guaranteed access to the courts, while at the same time carrying out the legislative policy of screening out frivolous lawsuits and defenses. . . . [T]he purpose of the . . . presuit requirements is to alleviate the high cost of medical negligence claims through early determination and prompt resolution of claims, not to deny access to the courts to plaintiffs . . . ." (Citation omitted; internal quotation marks omitted.)).

General Statutes §52-190a (a). I trust that no one seriously believes that the legislature intended the good faith certificate requirement to preclude recovery in such cases, as *Jarmie* itself recognized. See *Jarmie* v. *Troncale*, supra, 306 Conn. 586 ("nothing in the relevant statutory authority . . . of this state . . . precludes the plaintiff from bringing an action against the defendants on [ordinary] negligence grounds"). But that is where the logic of *Jarmie*'s literal and all-encompassing construction of the statute's first sentence leads.[14]

This court has twice rejected as implausible interpretations of §52-190a that were, if anything, less bizarre than results like this that follow from *Jarmie*'s literal reading of the statute. In *Dias* v. *Grady*, supra, 292 Conn. 350, this court rejected the argument that the statute requires an expert opinion letter as to causation. See id., 359–61. Because a similar health care provider is not required to give such an opinion at trial, we reasoned, it would be bizarre for the legislature to have required it at the pleading stage. Id., 361. Subsequently, in *Shortell* v. *Cavanagh*, supra, 300 Conn. 383, this court concluded that it would be absurd to interpret §52-190a to require an opinion letter from a similar health care provider in an informed consent case, when no such testimony is necessary at trial. See id., 388–90. We reached this conclusion even though informed consent is a species of negligence; see, e.g., *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 181, 896 A.2d 777 (2006); and, therefore, would seem to be encompassed within a literal reading of the statute.[15]

In the same way that a blindered reading of one portion of §52-190a does not justify the conclusion that the

---

[14]It is not necessary for present purposes to determine whether such results rise to the status of being "absurd or unworkable" for purposes of §1-2z.

[15]The Florida courts have likewise construed the substantially similar Florida statute broadly so as to avoid absurd results. See, e.g., *Pavolini* v. *Bird*, 769 So. 2d 410, 412–14 (Fla. App. 2000) (explaining that "[t]he notice requirement under the [Florida Medical Malpractice] Act is inextricably intertwined into the fabric of an overall statutory scheme designed to weed out meritless medical malpractice claims and [to] promote the prompt resolution of valid claims," and concluding that it

statute bars ordinary negligence or informed consent claims against health care providers, the same approach to construing a single word of the text cannot easily lead to the conclusion that the legislature intended silently to erect a bar to actions by nonpatients involving allegations of medical negligence. *Dias* and *Shortell* teach that the broad terms of the first sentence of the statute are qualified by its setting, which, in the present case, demonstrates that the statute is only addressed to claims of *medical negligence* brought by *patients*; it doesn't prohibit nonpatient claims any more than it prohibits ordinary negligence claims or informed consent claims.[16]

The bizarre results of a strict, literalist construction of §52-190a are seen in other ways as well. Under *Jarmie*, a killer can bring a claim against his negligent health care provider, but his victim cannot, despite the fact that both deaths were proximately caused by the very same medical negligence and the additional fact that the homicide victim would, in the view of many, have a stronger case in principle for tort compensation. Likewise, under *Jarmie*, the homicide victim may have a *Tarasoff* type claim if she were the estranged wife of the killer such that her wrongful death claim could be brought in the

would be absurd to subject parties seeking damages for loss of consortium arising from medical malpractice to statutory requirements), review denied, 790 So. 2d 1102 (Fla. 2001); see also part II B of this opinion (discussing close connection between Florida and Connecticut statutes).

[16]If we were to travel further afield from the issue at bar, *Jarmie*'s literalist approach to §52-190a would quickly ensnare us in additional interpretive difficulties. For example, the statute purports to regulate only "civil action[s]," not individual claims. Taken literally, this phraseology means that, even under *Jarmie*'s construction, nothing in §52-190a would bar a supplemental *Tarasoff* type claim by a nonpatient if that claim were brought as part of an "action" in which one of the plaintiffs—a "claimant"—also alleged that he or she had been subject to medical negligence as a patient. Under this reading, the decedent, who was not a patient, cannot bring a *Tarasoff* type action separate from Morrow's action against the defendant. But, if their claims had been brought as part of the same action—if, for example, the couple had been married and the executor of Morrow's estate had brought a single action on behalf of both estates—nothing in the statute would have barred the decedent's nonpatient claim (because the *action* would have alleged negligence in the care or treatment of a claimant).

same action as the killer's wrongful death claim, but an estranged girlfriend is without recourse. See footnote 16 of this opinion. One can imagine reasons why a legislature might opt to foreclose all nonpatient medical negligence claims or some meaningful subset of such claims. But it is inconceivable to me that the legislature intended to allow some *Tarasoff* claims, and to foreclose others, on the basis of arbitrary distinctions that bear no relation to the statutory purpose.

To summarize, *Jarmie* embodies many of the same vices that compelled us to overrule *Morgan*. The decision construed a purely procedural statute as curtailing, sub silentio, litigants' substantive rights. It did so in the face of, and without considering, plausible alternative constructions more consistent with a holistic reading of the statutory scheme. It ignored numerous principles of statutory construction: the importance of context and common sense, the perils of overgeneralization, the idea that the legislature typically conveys its intent expressly (especially when it has done so in like circumstances) and does not hide elephants in mouseholes, and the rule that statutes in derogation of the common law are strictly construed. *Jarmie* instead adopted a novel, forced construction that, taken to its logical conclusion, would lead to results bordering on the absurd. Even without recourse to the legislative history, then, I would conclude that *Jarmie*'s construction of the statute must be repudiated. At the very least, these various factors render the statute ambiguous with respect to the issue at hand.[17]

B

The foregoing analysis leads me to examine the legislative history of § 52-190a for additional guidance. See

[17]Yet another source of potential textual ambiguity, worthy of mention but not necessary to explore for present purposes, arises from the qualifying language in § 52-190a (a) providing that the requisite inquiry to establish good faith must be "reasonable . . . as permitted by the circumstances . . . ." Because a patient's medical records generally are subject to confidentiality rules under federal and state law, it seems plausible to understand this language as accommodating the

General Statutes §1-2z. The parties and the majority agree that the lengthy legislative debates regarding Tort Reform I make no reference to nonpatient claims. See footnote 14 of the majority opinion. This omission in itself adds force to my concern about elephants hidden in mouseholes. Just as one would reasonably expect a plain statement in the statutory text that the legislature intended to foreclose an entire category of claims to an entire class of plaintiffs, it is virtually unthinkable that such a bold, substantive innovation would have passed without any comment in the lengthy legislative history of tort reform. See, e.g., *Chisom* v. *Roemer*, 501 U.S. 380, 396 n.23, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991) (articulating "the dog that did not bark" canon of statutory construction); see also *Bennett* v. *New Milford Hospital, Inc.*, 300 Conn. 1, 26–28, 12 A.3d 865 (2011) (applying principle in context of §52-190a); *King* v. *Sultar*, 253 Conn. 429, 451, 754 A.2d 782 (2000) (same).

The drafting history of the statute provides strong evidence for the conclusion that no such meaning should be attributed to it. Two aspects of that history in particular support my conclusion that *Plainville* got it right and that the legislature, in imposing a good faith certificate requirement, did not intend to foreclose *Tarasoff* type claims involving allegations of medical negligence brought by nonpatients.

1

First, and most tellingly, §52-190a was modeled on a Florida statute that had been enacted the year before § 52-190a was enacted. See Fla. Stat. Ann. §766.104 (West 2024). The Florida statute uses almost identical language,[18] and a report contained in the bill file to

circumstances of a nonpatient who has only limited presuit access to such records.

[18]The Florida statute, as it existed in 1986, provided in relevant part: "No action shall be filed for personal injury or wrongful death arising out of medical negligence, whether in tort or in contract, unless the attorney filing the action has made a reasonable investigation as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. . . ." Fla. Stat. § 768.495 (1) (Supp. 1986).

P.A. 86-338 confirms that the Law Review Committee of the Governor's Task Force on Insurance Costs and Availability was inspired by Florida law in recommending that our legislature consider "allowing attorneys to obtain a so-called 'certificate of merit' . . . to satisfy the 'reasonable inquiry' and 'good faith' responsibilities."[19] For this reason, our construction of § 52-190a, to the extent it relates to language drawn from the Florida model, should give serious consideration to the construction accorded to that language by Florida courts. See, e.*g.*, *State* v. *Carter*, 350 Conn. 43, 58, 323 A.3d 297 (2024) ("when [a] Connecticut statute has been modeled on that of another jurisdiction, the judicial interpretation . . . accorded [to that other jurisdiction's] act is of great assistance and persuasive force in the interpretation of our own act" (internal quotation marks omitted)).

It was understood from the outset in Florida that Fla. Stat. Ann. § 766.104 was purely procedural in nature.[20] Accordingly, and notwithstanding that § 766.104 (1) contains language identical to § 52-190a (a) requiring "a good faith belief that there has been negligence in the care or treatment of the claimant," the Florida statute has never been interpreted to bar actions by nonpatients alleging medical negligence. See, e.*g.*, *Pate* v. *Threlkel*, 661 So. 2d 278, 281–82 (Fla. 1995) (noting that "the plaintiffs have pled [good faith] compliance with [§] 766.104," allowing third-party action to proceed, and holding that, "when the prevailing standard

---

[19] See Report of the Law Review Committee of the Governor's Task Force on Insurance Costs and Availability (1986), ex. 2. The legislative history of P.A. 86-338 indicates that another contemporaneous malpractice reform statute, No. 85-574 of the 1985 Public Acts, also had been "modeled after similar Florida legislation . . . ." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1986 Sess., p. 2167.

[20] See, e.*g.*, F. Hawkes, "The Second Reformation: Florida's Medical Malpractice Law," 13 Fla. St. U. L. Rev. 747, 760, 778 (1985); see also *Nash* v. *Humana Sun Bay Community Hospital, Inc.*, 526 So. 2d 1036, 1038–39 (Fla. App.) (good faith certificate requirement is not "an essential element" of medical malpractice cause of action), review denied sub nom. *Schneider* v. *Nash*, 531 So. 2d 1354 (Fla. 1988).

of care creates a duty that is obviously for the benefit of certain identified third parties and the physician knows of the existence of those third parties, then the physician's duty runs to those third parties"); see also *J.B.* v. *Sacred Heart Hospital of Pensacola*, 635 So. 2d 945, 946–47, 949 (Fla. 1994) (allowing *Cochran* type claim to proceed). But cf. *Boynton* v. *Burglass*, 590 So. 2d 446, 447 (Fla. App. 1991) (declining to adopt *Tarasoff* duty under state common law).

The Florida District Court of Appeals explained why the Florida statute does not bar third-party medical negligence claims: "[T]o be a claimant under the [Florida Medical Malpractice] Act, the person presenting the claim must have received negligent medical care and treatment from a medical care provider that resulted in the person's injury or death. . . . If the person making the claim did not receive negligent medical care or treatment, the person does not qualify as a claimant under the [a]ct by definition *and hence cannot be required to comply with the* [*presuit*] *notice and investigation requirements of the* [*a*]*ct*." (Citation omitted; emphasis added.) *Pavolini* v. *Bird*, 769 So. 2d 410, 413 (Fla. App. 2000), review denied, 790 So. 2d 1102 (Fla. 2001).[21] In other words, Florida courts construe the same statutory text—the very language on which §52-190a was modeled—to draw a distinction between plaintiffs and claimants (i.e., patients) and to hold that the statute applies only to those cases in which personal injury or wrongful death *of a claimant* is alleged.

2

Also instructive is the history of our legislature's efforts to address the perceived problem of frivolous medical negligence claims. Prior to the enactment of Tort Reform I in 1986, Connecticut law provided a mechanism by which the parties to a medical negligence action could, at their option, convene a malpractice screening panel

---

[21]Although *Pavolini* involved a derivative claim; see *Pavolini* v. *Bird*, supra, 769 So. 2d 411; the quoted analysis is equally applicable to independent actions brought by nonpatients.

comprised of doctors and lawyers to opine as to the merits of the plaintiff's claims. See General Statutes (Rev. to 1985) §§ 38-19b through 38-19f. However, parties rarely if ever availed themselves of that option. See Report of the Law Review Committee of the Governor's Task Force on Insurance Costs and Availability (1986) p. 22.

As initially drafted, the bill that ultimately became P.A. 86-338 would have retained the screening panel mechanism but made its use mandatory in all medical malpractice actions. See Raised Bill No. 6134, 1986 Sess., § 13; Substitute House Bill No. 6134, 1986 Sess., § 10. The initial draft provided in relevant part that "[n]o civil action for medical malpractice shall be commenced . . . until a written notice of the intention to commence such action has been filed" with the screening panel and the panel has made a finding as to liability. Substitute House Bill No. 6134, supra, § 10. For present purposes, the important point is that nothing in the language of the draft legislation would even arguably have precluded actions by nonpatients involving allegations of medical negligence.

Substitute House Bill No. 6134 was referred back to the Judiciary Committee on March 31, 1986. The committee held hearings on the bill, and, in late April, it recommended an amended version (subsequently adopted as House Amendment A) that omitted the mandatory screening panel provision.[22] Instead, that amendment contained the good faith certificate requirement, borrowed from Florida, that was subsequently codified at § 52-190a (a). Both the House and the Senate adopted the amendment the following week, without any debate

---

[22]Although it is not clear from the legislative record why this provision was removed, the decision may have been a response to prior testimony before the committee in which concerns were expressed that use of a mandatory screening panel would (1) function to exclude some meritorious medical malpractice claims, and (2) fail to lower defense costs, insofar as each case would have to be litigated twice, once before a panel and a second time before a jury. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1986 Sess., p. 239.

or discussion regarding the new good faith certificate requirement.

It is undisputed that "the purpose of the original version of § 52-190a was to prevent frivolous medical malpractice actions." *Dias* v. *Grady*, supra, 292 Conn. 357; see also *Carpenter* v. *Daar*, supra, 346 Conn. 124 ("*Morgan* has created roadblocks for otherwise meritorious cases that are squarely at odds with the legislature's limited goal of ensuring an adequate, good faith investigation and eliminating *only* frivolous cases" (emphasis added)). It is clear from the legislative history that the Judiciary Committee inserted the relevant language into the bill at the eleventh hour, and it was approved with little apparent scrutiny. In my view, there is simply no reasonable possibility that, when the legislature abandoned the idea of the mandatory screening panel and found a ready replacement in Florida's good faith certificate requirement, it meant to incorporate thereby hidden restrictions on plaintiffs' substantive rights that Florida itself has never found in the source statute.[23]

C

A word is needed regarding the proper application of the statutory construction adopted in *Plainville*, which I

[23]This historical account is consistent with the various summaries and explanations of the good faith inquiry provision contained in the bill file to P.A. 86-338. Not only do those summaries fail to note any implications for third-party or nonpatient claims, in most cases, they do not even include the key statutory language on which *Jarmie* relied: "'negligence in the *care or treatment of the claimant*.'" (Emphasis in original.) *Jarmie* v. *Troncale*, supra, 306 Conn. 587. For example, a memo from the Judiciary Committee to Representative Richard D. Tulisano summarizing House Amendment A stated that a "[p]laintiff's counsel must file a certificate stating that there are grounds for a good faith belief *that there has been negligence*." (Emphasis added.) Memorandum from the Judiciary Committee to Representative Richard D. Tulisano (April 28, 1986) p. 14. An Office of Legislative Research bill analysis stated that "[t]he bill prohibits the filing of a medical malpractice lawsuit unless the attorney or party has made a reasonable inquiry, as permitted by the circumstances, to determine that there are grounds for a good faith belief *that there has been negligence*." (Emphasis added.) Office of Legislative Research, Amended Bill Analysis, Substitute House Bill

believe is the correct one. Because there is no indication that the legislature, in enacting § 52-190a, contemplated or considered the class of cases involving allegations of medical negligence brought against health care providers by nonpatients, a court seeking to apply the statute to such cases under the *Plainville* construction has two options.

The first option is the one that Judge Pittman adopted in *Plainville*; see *Plainville* v. *Wheeler Clinic, Inc.*, supra, 46 Conn. L. Rptr. 813–14; and that Florida courts have embraced. See, e.g., *Pavolini* v. *Bird*, supra, 769 So. 2d 413. These courts concluded that, because the statute was intended to encompass only those claims brought by patients, nonpatient plaintiffs asserting claims involving allegations of medical negligence are not required to comply with the good faith certificate and opinion letter requirements. This approach makes sense to the extent that one views the statute as part of a larger compromise, pursuant to which legislators agreed in this part of the tort reform package to address the chief cause of the perceived problem relating to medical malpractice, which was frivolous medical malpractice actions brought by patients. Claims by nonpatients are relatively rare, and nonpatients in any event typically will not have access to the confidential patient medical records that would be the focus of a good faith inquiry, at least not at the initial, prefiling stage of the litigation process. Accordingly, requiring a good faith inquiry in those cases, which account for a tiny fraction of all medical negligence claims, could place an undue burden on plaintiffs while doing little to advance the statutory purpose

No. 6134, as amended by House Amendments A, C, and G, and Senate Amendments B and E, An Act Concerning Tort Reform (1986) p. 12. A third, unidentified summary of the amendment stated that the bill "provides that an attorney or party filing a medical malpractice action may satisfy the reasonable inquiry standard . . . by obtaining a certificate from a physician *evidencing malpractice*." (Emphasis added.) Although such summaries are hardly dispositive of the intent of the drafters, let alone the question of the statute's meaning, they do reinforce the impression that no one at the time appeared to be focused on what the *Jarmie* majority considered to be a key consequence of the statute.

of winnowing the meritorious claims from the frivolous ones. See, e.*g.*, *Pavolini* v. *Bird*, supra, 413–14. This approach would construe the statute to exclude altogether the special case of nonpatient suits and leave it to the legislature to amend the statute if it wishes to fill in the gap.

The second option is to adopt, as a common-law rule applicable to nonpatients who bring claims alleging medical negligence against health care providers, the same procedural requirements that § 52-190a imposes on patients who bring such claims. The procedural requirement would not be imposed as a matter of statutory construction, but as a judge made, common-law rule designed to implement a procedure in medical negligence cases that serves current social interests at the same time it creates a uniform and harmonious system consistent with the procedures imposed by § 52-190a on patients bringing such claims.

Either approach is reasonable, and I see no need to express my preference at this point. We need not choose between them for present purposes, insofar as the plaintiff complied with § 52-190a by attaching a good faith certificate and opinion letter to her complaint. If nothing else, this concurring and dissenting opinion highlights the need for further legislative attention to the statute.

### III

I dissent from part III of the majority opinion, in which the majority holds that the plaintiff has inadequately briefed her claim on appeal that the trial court had erroneously struck count seven of the operative complaint, alleging a claim of gross negligence against the defendant. I agree that the argument is not presented in the robust fashion that is optimal, and sometimes necessary, for proper determination of an issue on appeal.[24] I believe,

[24]Lawyers briefing a complex appeal involving multiple issues must make difficult decisions about how best to allocate their words in light of the aggregate limitations under our rules of practice. See, e.*g.*, Practice Book § 67-3A (limiting primary briefs to 13,500 words). A party may by motion seek to expand the permissible word count. See

however, that we should exercise our discretion sparingly to deem a claim forfeited due to inadequate briefing, and should do so only when the particular legal grounds supporting the argument cannot reasonably and readily be discerned, or when the court determines that the party's failure to more fully elaborate the argument is the result of a lack of concern or substance rather than word limitations. "[T]he rules of practice are to be construed liberally, rather than narrowly and technically, in order to facilitate judicial business and to advance justice. . . . Courts usually favor a party's right of appeal and construe statutes and rules to protect that prerogative . . . . The essential policy animating this broad judicial approach is . . . that courts should consider cases on their merits and in terms of a party's substantive rights and not defeat them on mere technicalities." (Citations omitted; internal quotation marks omitted.) *In re Taijha H.-B.*, 333 Conn. 297, 310–11, 216 A.3d 601 (2019).

The plaintiff's argument is simple and straightforward: her claim of gross negligence is cognizable, notwithstanding the holding in *Jarmie*, for the same reasons that this court concluded that the plaintiffs' personal injury claims were cognizable in *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 113 A.3d 932 (2015), a unanimous decision issued three years after *Jarmie*. The majority deems this argument inadequately briefed because the plaintiff fails to explain why *Squeo* cannot be distinguished, inasmuch as *Squeo* involved a "derivative" personal injury claim by nonpatients for bystander emotional distress, whereas the present case involves a nonpatient's wrongful death claim. Part III of the majority opinion.

No doubt it would be preferable to know the plaintiff's response to possible points of distinction. But there is a difference between an argument that is directionless or indecipherable on its own terms, on the one hand, and an argument that may prove unpersuasive on the merits

Practice Book § 67-3A (setting forth procedures to request permission to exceed word limitations).

because it fails to anticipate or rebut countervailing arguments, on the other. In my view, the plaintiff's gross negligence claim is sufficiently clear and legally grounded to warrant review on the merits.

It does not take a great feat of imagination to apprehend the plaintiff's argument. *Squeo* expressed its holding as follows: "We are unable to conclude, as a matter of law, that a hospital that discharges a potentially suicidal patient under the circumstances alleged could not have demonstrated gross negligence in so doing, when the patient then proceeded to take his own life shortly after discharge." *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 581. Changing two inessential words of this holding illuminates the plaintiff's argument that the reasoning of *Squeo* permits her claim of gross negligence to go forward in the present case: "We are unable to conclude, as a matter of law, that a hospital that discharges a potentially [homicidal] patient under the circumstances alleged could not have demonstrated gross negligence in so doing, when the patient then proceeded to take his [ex-girlfriend's] life shortly after discharge." Id.

This court is perfectly capable of taking the argument presented by the plaintiff and determining for itself whether the holding in *Squeo* is, and should be, distinguishable in the present circumstances. Indeed, the majority's treatment of the plaintiff's *Squeo* based argument indicates that it fully apprehends the issues, because the majority identifies and even adverts to the merits of the potentially distinguishing features that the majority considers inadequately briefed, i.e., the fact that a bystander emotional distress claim is a "derivative" claim whereas a wrongful death claim is not, and the legal sufficiency of the allegations on which the plaintiff bases her gross negligence claim. Part III of the majority opinion. I believe that the plaintiff's gross negligence argument, read in the light of her entire brief, warrants adjudication on the merits. I would reach the merits

and, for the following reasons, reverse the trial court's decision striking the gross negligence count.

First, I consider it highly significant that the court in *Squeo* did not see *Jarmie* or § 52-190a as foreclosing, as a matter of law, the court's conclusion that Connecticut recognizes a claim of bystander emotional distress grounded in the defendant health care providers' medical negligence in the care or treatment of someone other than the nonpatient plaintiffs. See *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 568, 574. *Squeo* was decided three short years after *Jarmie* and was authored in plain view of § 52-190a by a member of the panel that decided *Jarmie*. The decision mentions *Jarmie* only in passing; see id., 574; and does not so much as mention the statute, which, if applicable, would have required the court to reject the plaintiffs' claim without further analysis. In the language of the statute, as construed in *Jarmie*, the parents' claim in *Squeo* would be barred by § 52-190a because the parents (1) sought to recover damages in tort for "personal injur[ies]" sustained by them (2) as a result of the alleged "negligence of a health care provider" (3) whose "care or treatment" was provided, not to the parents ("the claimant[s]") themselves, but to their son.

I see no good response to this point. It is true that the defendants in *Squeo* evidently did not raise *Jarmie* or § 52-190a as a bar to the parents' claim, but I consider it well-nigh impossible to imagine that this court would spend pages upon pages analyzing and adjudicating a common-law issue of first impression—whether Connecticut common law recognizes a bystander emotional distress claim based on allegations of medical negligence—when that very claim is barred by statute under the unequivocal holding of a case decided by the court just three years earlier. See *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 568–81. Viewing *Squeo* in such a manner would render its elaborately reasoned, novel holding a dead letter of little or no precedential value because any defendant citing *Jarmie* in response

to a *Squeo* type claim would prevail as a matter of law regardless.

It is also unavailing to suggest that *Squeo* is distinguishable because a claim for bystander emotional distress is "derivative" in nature and therefore somehow avoids the *Jarmie* prohibition of nonpatient claims. Part III of the majority opinion. First, nothing in the court's analysis in *Squeo* states or suggests that its outcome depends in the slightest on the derivative nature of the nonpatients' claim. The opinion contains a single reference to that term, which appears in the background discussion prior to the analysis of the plaintiffs' legal claims. See *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 564. The legal analysis itself, which spans more than ten pages, never mentions that the claim is a derivative one, and its reasoning does not rely on that fact. See id., 568–81. Second, nothing in the court's analysis in *Jarmie* states or suggests that its construction of § 52-190a as barring all actions by nonpatients would not extend to bystander emotional distress and other claims that are derivative of a patient's primary injury. As construed in *Jarmie*, the text of § 52-190a bars any claim in which the plaintiff (i.e., "the claimant") is not the patient but nevertheless seeks "to recover damages resulting from personal injury . . . [and] in which it is alleged that such injury or death resulted from the negligence of a health care provider . . . ." General Statutes § 52-190a (a). A claim of bystander emotional distress in this context does not seek recovery for injuries or harm sustained by the patient; it seeks damages for personal injuries sustained by the nonpatient plaintiff and, as such, falls squarely within the statutory prohibition, as construed in *Jarmie*, regardless of whether the claim is "derivative" in nature.

Finally, glancing up for a moment from the doctrinal technicalities to view the legal landscape being regulated, it is counterintuitive, to say the least, to believe that the legislature intended § 52-190a to permit a claim by nonpatients (the parents in *Squeo*) for the emotional

harm they suffered as a result of witnessing the consequences of medical malpractice, but to bar a claim by a nonpatient (the decedent in the present case) for the mortal, physical harm she suffered as a result of being a direct victim of the consequences of medical negligence. To illustrate the point, consider how today's holding would adjudicate a case in which the parents in *Squeo* sought damages for emotional distress after witnessing their son kill his girlfriend (instead of himself) upon release from a hospital for having homicidal (instead of suicidal) thoughts. I am unwilling to accept the notion that a well pleaded "derivative" claim of emotional distress is permitted but that the nonderivative wrongful death claim of the decedent's executor is barred. I trust that this court would not allow our self-created doctrinal jumble to require it to impute such a bizarre and unjust intention to our legislature.

Two questions remain. First, does Connecticut law recognize a claim in tort for gross negligence? And, second, if so, does § 52-190a, as construed in *Jarmie*, bar a claim by a nonpatient for damages sustained as a result of the gross negligence of a health care provider? In my view, the answer to both questions is found by necessary implication in *Squeo*, which held that the nonpatient plaintiffs could maintain a personal injury claim arising from the gross negligence of a health care provider. *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 581. Gross negligence in the care or treatment of the patient was the specific standard of liability identified by the court.[25] Gross negligence is not the same as negli-

---

[25] I understand that this court has stated in other contexts that "Connecticut does not recognize degrees of negligence and, consequently, does not recognize the tort of gross negligence as a separate basis of liability." *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 337, 885 A.2d 734 (2005). However, this court has specifically defined a gross negligence standard as applied to medical malpractice actions; see *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 813, 945 A.2d 955 (2008); and *Squeo* went a step further by recognizing a claim of gross negligence for bystander emotional distress arising from medical negligence. See *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 568, 574. *Squeo*, for its part, did not alter the legal standard for

gence, as *Squeo* makes clear. Id., 579–80. Connecticut law more generally defines gross negligence "to mean no care at all, or the omission of such care [that] even the most inattentive and thoughtless seldom fail to make their concern, evincing a reckless temperament and lack of care, practically [wilful] in its nature." (Internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 352, 885 A.2d 734 (2005) (*Norcott, J.*, dissenting); see also *C & H Electric, Inc.* v. *Bethel*, 312 Conn. 843, 869, 96 A.3d 477 (2014) ("[g]ross negligence requires conduct that 'betokens a reckless indifference to the rights of others' "); 57A Am. Jur. 2d 296–97, Negligence § 227 (2004) (" 'Gross negligence' means more than momentary thoughtlessness, inadvertence or error of judgment; hence, it requires proof of something more than the lack of ordinary care. It implies an extreme departure from the ordinary standard of care, aggravated disregard for the rights and safety of others, or negligence substantially and appreciably greater than ordinary negligence." (Footnotes omitted.)). Considered in the proper light under the standard applicable at this stage, the allegations contained in count seven of the plaintiff's complaint plainly state a claim of gross negligence.

IV

In the relatively short time since *Jarmie* has been on the books, it has already done significant damage to the development of our common law relating to the liability of health care professionals for harm caused to others resulting from medical negligence in the care or treatment of a patient. This distorting effect is attributable to the simple fact that *Jarmie* construed § 52-190a to bar any third-party medical negligence claim requiring

___

establishing a bystander emotional distress claim; it altered the legal standard of medical negligence necessary for a nonpatient to recover damages for bystander emotional distress arising from the care or treatment provided by a health care provider to a patient. I cannot think of a reason why the same reasoning would not, at the very least, permit a nonpatient's wrongful death claim to proceed based on allegations of gross negligence by the patient's medical care providers.

expert testimony to establish the standard of care. This holding has cast a long shadow over the development of related common-law doctrine over the past fourteen years, including the decision in the present case, because of the perceived need to evade the apparent strictures of § 52-190a that have required the court to formulate theories of liability that can be established without expert medical testimony. I agree with the majority that, if *Jarmie* were to be overruled, this court would be required to decide anew what common-law path to follow, unfettered by the constraints imposed by *Jarmie*. In the context of a *Tarasoff* type claim in particular, the question will be what affirmative duty of care mental health care providers owe to identifiable victims at risk of harm from a patient. See, e.g., 2 Restatement (Third), Torts, Liability for Physical and Emotional Harm § 41 (b) (4), p. 65 (2012); see also *Fraser* v. *United States*, supra, 236 Conn. 633–34 (discussing common-law identifiable victim doctrine in this context).

Because *Jarmie* still controls, I concur in the result reached in parts I and II of the majority opinion. I respectfully dissent from part III of that opinion.